WILLIAM H. WILLIAMS v. SCHOOL DISTRICT No. 6, IN NEWFANE.

*School Districts. Constitutional Law.*

The taking of land for the location of a district school-house is for a *public use;* and therefore the act of 1857, (No. 58, p. 71,) providing for taking land *in invitum* for that purpose, and having the damages appraised and paid, is not unconstitutional.

Under that act the quantity of land allowed to be taken is not limited to the mere *site* of the school-house, but it also includes such adjacent land for the purpose of a yard, etc., as the selectmen or commissioners may think requisite.

CERTIORARI to revise the proceedings of the county court in regard to the location of the defendant's school-house on the plaintiff's land.

It appeared that the selectmen of Newfane, on the 14th of August, 1858, at the request of the defendant's prudential committee, under the law of 1857, entitled "an act in relation to the location of school-houses," (see acts of 1857, No. 58, p. 71,) located the defendant's school-house upon certain land belonging to the plaintiff, and caused the land so designated for such location, containing half an acre, to be surveyed and described by metes and bounds; that the selectmen further adjudged that the defendants should build and maintain a good and sufficient fence between the land so located and the adjoining land of the plaintiff, and that they appraised the damages to be paid for such location by the defendants to the plaintiff at one hundred dollars; that the plaintiff, being dissatisfied with such location and appraisal, applied to the county court at the September term, 1858, to appoint three commissioners to inquire into the convenience and necessity of such school-house, and the manner in which the same had been located, and the damages sustained by the plaintiff; that the county court appointed three commissioners in conformity with the act above referred to, who reported that the location made by the selectmen was a judicious one and should not be set aside, and appraised the plaintiff's damages by reason of such location at seventy-five dollars; and that the

county court thereupon ordered that the commissioners' report be accepted and the said location of the school-house be established, and that the defendants pay the plaintiff the amount of damages reported by the commissioners, and have possession of the land in question by the 8th of May following, provided they should fence the same.

In the petition for the present writ, the plaintiff claimed that the statute under which such proceedings were had was unconstitutional, and that the county court otherwise erred in ordering certain fences to be built by the defendants as part of the damages to which the plaintiff was entitled.

*Butler & Wheeler*, for the plaintiff.

I. The act of 1857 which authorizes the taking the petitioner's land, is unconstitutional and void ; Const. Art. 2, (Comp. Stat., 31.)

1. Because the appropriation of property to the use of a school district is not a public one.

The words, "*public use*," are used in a sovereign and not popular sense, and signify a use to the whole people ; TRACY, Senator, in *Bloodgood* v. *M. & H. R. R. Co.*, 18 Wendell 165.

This eminent domain should never be exercised to transfer property from one individual or corporation to another, unless the individual or corporation becomes the means by which the public use the property taken. This is not the case when the appropriation is to the use of a school district.

The district take to their own use exclusively ; hence no others are interested in their acquisition ; *Haynes* v. *Cohoes Co.*, 3 Barb. 42.

The exercise of eminent domain has only been sanctioned by courts where the appropriation has been in such a manner that all might enjoy it.

Highways, turnpikes, railways, canals and mills are instances ; *White R. T. Co.* v. *Vt. C. R. R. Co.*, 21 Vt. 590 ; *Bloodgood* v. *M. & H. R. R. Co.*, 18 Wendell 9 ; *Pet'n of Mt. Wash. Road Co.*, 35 N. H. 134.

2. If taking a sufficient easement in land for the location,

maintaining and enjoyment of a school-house upon it be constitutional, yet the legislature has no authority to authorize the taking a fee-simple in the land.

The owner is deprived of the whole residue, which must either be appropriated by the district to other than educational purposes, or it must lie idle; *In the matter of Albany Street*, 11 Wend. 149; *Varick* v. *Smith*, 5 Paige 159.

3. A necessity must exist upon which to predicate the exercise of the eminent domain; Angell on Watercourses 532 and cases cited.

Such an obstacle must interpose between the public and the use of the property taken as would probably defeat the object of the appropriation, without the right to take the property against the owner's will.

Such a necessity exists in cases of highways, turnpikes and railways, which ordinarily cross the lands of a large number of owners, some of whom would be obstinate.

A school house is ordinarily set on one man's land, and competition would bring him to reasonable terms.

There is no judgment by any tribunal, that the taking was unnecessary in this instance.

II. If the act authorizes only taking an easement in the land commensurate with the location, maintenance and enjoyment of a school house upon it, there is error in taking and fencing a yard around the house, and this excludes the petitioner from the enjoyment of the residue; 35 Eng. Com. Law, 422.

III. The petitioner was entitled to have compensation in money; the court below have awarded him part payment in fence; Const., Art. 2; *Van Horne's Lessee* v. *Derrance*, 2 Dal., 313.

*Charles K. Field* and *Peck & Colby* for the defendants.

1. The constitutionality of the law of 1857 may be safely assumed for the reason that this court has repeatedly sustained similar enactments; *Hatch* v. *Vt. C. R. R.*, 25 Vt. 49; *Richardson* v. *same*, 25 Vt. 465.

It is incident to the sovereignty of every government that it may pass laws appropriating private property for public uses, of the necessity and expediency of which the government must judge; 2 Kent Comm. 338, 340; *Gardner* v. *Newburgh*, 2 John-

18

son's Ch. 162; *Lumbard* v. *Stearns*, 4 Cushing 60; *Edwards and wife* v. *Stonington Cemetery Association*, 20 Conn. 466; *Beekman* v. *Sarat. & S. R. R. Co.*, 3 Paige 45, 73; U. S. Digest vol. 16, 135, sec. 127; U. S. Digest vol. 17, 128, sec. 88, 92, 98.

2. The commissioners who assessed the damages were empowered to impose upon the district the burthen of the fences in lieu of a payment in money; *Livermore et al.* v. *Jamaica*, 23 Vt. 361; Angell on Highways, 91, sec. 115.

A different rule would render void the statute providing for the erection of bars and gates across pent roads: Comp. Stat., chap. 22, sec. 3.

3. If the court shall discover that greater injury would result from quashing the proceedings of the inferior tribunal, than from letting them remain, they will refuse to issue the writ; *Royalton* v. *Fox et al.*, 5 Vt. 458; *Rockingham and Grafton* v. *Westminster*, 24 Vt. 288; *West River Bridge Co.* v. *Dix et al.*, 16 Vt. 446.

POLAND J. The petitioner claims that the act of 1857, under which his land was taken by the school district for a site for a school house, is unconstitutional and void, upon the ground that such taking was not for a *public use.*

From the earliest period in this State, the proper education of all the children of its inhabitants has been regarded as a matter of vital interest to the State, a duty which devolved upon its government, and which should be fulfilled at the public expense.

The constitution of the State especially enjoins upon the legislature the duty of passing laws to carry out this object, and declares that a competent number of schools ought to be maintained in each town, for the convenient instruction of youth.

The legislature of the State, in obedience to this injunction of the constitution, have from the first, taken this subject in hand, and provided by law for the support of schools at the public expense, and it has always been understood to be one of the first and highest duties of the government.

In order to attain and effectuate this wise and beneficial purpose, it was necessary that some system should be devised by which the State should be divided into such convenient territo-

rial sub-divisions as would bring schools within reach of all its inhabitants.

It was therefore early provided by law, that each town should keep and maintain at least one school within its limits, and when all the inhabitants of any town could not conveniently be accommodated at one school, it was made the duty of such town to divide the town into such number of school districts as would be convenient for the inhabitants.

These districts, when organized, are made public municipal corporations, are required to make annual elections of officers, and to maintain schools therein.

It is made the duty of these school districts to erect and maintain suitable school houses, to be paid for by a compulsory tax upon the inhabitants.

The districts are authorized to vote and collect taxes to pay for school houses, and lands on which to erect them, and are also required to raise taxes to support their schools, if needful, beyond the amount of the general school tax of the State.

By a general law of the State, which has been in force for many years, the selectmen of each town are required to assess an annual tax upon the list of the town, to be divided among the several school districts of the town, toward defraying the expense of schools, and the annual income of the money received by this State from the United States treasury many years since, was by the legislature devoted to the same purpose.

Within a few years the legislature has seen fit to put the general oversight and superintendence of our common schools, to a considerable extent, into the care of officers appointed by the State and paid from its treasury, and have annually appointed a State superintendent of schools, and a board of education.

Without making further reference to the almost numberless acts of the legislature, exhibiting the most active watchfulness and fostering care, for the cause of popular education, enough has already been stated to show that the whole subject of the maintenance and support of common schools has ever been regarded in this State as one not only of public usefulness, but of public necessity, and one which the State in its sovereign character was bound to sustain.

An d it would seem difficult to see upon what just ground public taxes are imposed and collected for the erection of school houses and the support of schools, except that of their general public use and benefit.

This short statement, seems to me, to demonstrate more conclusively the public character of the use for which this land was taken, than would be possible by any process of reasoning, or any examination of authorities; but as some difference of opinion exists among the members of the court, on this question, I propose to examine breifly for the purpose of showing what has been understood to be a public use, by the legislatures and courts of other States, whose constitutions are substantially like our own in prohibiting the taking of private property, except for necessary public use.

The case does not call for any general discussion of the general doctrines growing out of the right of eminent domain, but is narrowed to the single inquiry whether the use for which this land was taken, was a necessary public use.

It seems to be universally settled that the lands of private persons may be taken without their consent, for the purpose of public highways, however local their character, and unimportant to the public in general.

Our statute authorizes selectmen to lay out cross roads or pent roads, with bars or gates across them, which ordinarily are for the individual convenience of a very small number of persons, and often for the benefit of a single family.  Still these are regarded as such public highways as authorize the compulsory taking of private property; *Paine* v. *Leicester*, 22 Vt. 44; *Whitingham* v. *Bowen et al.*, 22 Vt. 317.

It was for some time a disputed point, whether rail roads, owned by private corporations, were so far of the character of public works, that lands, taken for their construction, could fairly be said to be taken for public use, and in some of the States the question was not settled until after long and heated controversy. The objections to their being thus considered arose from their ownership by private corporations, and it was claimed they could not be considered public highways, because they were not open to be traveled by the public like common highways, but their use

was restricted solely to the cars and carriages of the company. But these apparently formidable objections were finally overcome, and, so far as we know, in every State of the Union, lands are allowed to be taken compulsorily for rail roads, and in consequence of their extensive benefits, and general use by the public, they are considered entitled to the exercise of this power of the government in their favor. The same doctrine has been applied to the taking of lands for the construction of turnpike roads, canals, wharves and ferries.

In several of the States, individuals and private corporations have been authorized by the legislature to lay aqueducts, for the purpose of supplying towns and villages with water, through the lands of private persons by making compensation for the damage, and the validity of such acts have been directly sanctioned by the courts of New York and Massachusetts, and nowhere denied, so far as I have been able to ascertain; *Lumbard* v. *Stearns*, 4 Cush. 60; *Gardner* v. *Newburgh*, 2 John. Ch. 162.

In the first of these cases, SHAW Ch. J. says, "the supply of a large number of inhabitants with pure water is a public purpose."

Acts have been passed in many of the States authorizing the draining of swamps and marshes, and giving the right to enter upon and take lands for that purpose, by the payment of damages to the owners.

In *Hartwell* v. *Armstrong et al.*, 19 Barb. 166, the validity of one of this class of acts was brought before the court, and fully sustained by the supreme court of the fifth judicial district, and in the opinion of the court it is stated that such acts have been common in that State for fifty years, and never before questioned.

In Connecticut, a statute authorizing the taking of land for a burying ground, received the sanction of the court, in *Edwards & wife* v. *Stonington Cemetery Association*, 20 Conn. 466.

It deserves also to be stated that a law exists in Connecticut almost identical with the one now in question, passed in 1854, but I do not learn that it has ever been before the court.

In *Hayward et al.* v. *Mayor &c. of New York*, 3 Seld. 314, there arose an important litigation as to whether lands taken compulsorily for an alms house, under an act of the legislature, upon

the removal of the alms house, reverted to the former owner; and though the amount involved was large, and the case appears to have been sharply contested, no question was raised but that the original taking was valid.

In the State of Massachusetts, laws have existed from a very early period authorizing the flowing of lands by the erection of mills and dams, by making compensation to the owners of such lands for the damages, and though cases arising under such laws have been repeatedly before their courts, I do not find that their constitutionality has been questioned. Similar laws exist now in several other States, but the only States where their validity has been settled, so far as I have discovered, are Wisconsin and Tennessee. In both those States they were held to be constitutional; Newcomb v. Smith, 1 Chand. (Wis.) 71; Thien v. Vorghtlander, 3 Wis. 461; Harding v. Goodlett, 3 Yerg, (Tenn.) 41.

No such legislation has been adopted in this State, and it seems to me that at least it steps to the very verge of constitutional limit, if not beyond. but it is doubtless true that the differences in the face of the country, and quantity of water power in different States, create a great difference in the public necessities and wants in that respect.

It is hardly to be supposed that in this State any necessity will ever exist to render such legislation necessary or proper.

The general spirit of the legislation and decisions on this subject, is questioned more by WOODBURY, J., in a separate opinion delivered by him, in West River Bridge Co. v. Dix et al., 6 How. 507, than in any other case or judicial opinion I have seen. He says, " but when we go to other public uses not so urgent, not connected with precise localities, not difficult to be provided for without this power of eminent domain, and in places where it would be only convenient, but not necessary, I entertain strong doubts of its applicability. Who ever heard of laws to condemn private property for public use, for a marine hospital or State prison ? So a custom house is a public use for the general government, and a court house or jail for a State. But it would be difficult to find precedent or argument to justify taking private property without consent to erect them on, though appropriate for the purpose. No necessity seems to exist which is sufficient to

justify so strong a measure. A particular locality as to a few rods in respect to their site is usually of no consequence, while as to a light house, or fort, or wharf, or highway between certain termini, it may be very important and imperative," &c.

It deserves to be remarked, however, that the only question before the court in that case was, whether the legislature had power to authorize taking a turnpike road or bridge and converting it into a free road or bridge, so that what is said by Judge WOODBURY must be regarded merely as the expression of his own opinion, and not the judgment of the court.

So far as the present case is concerned, a very sufficient answer to these suggestions of Judge WOODBURY is found in the principle that seems now to be universally established by the decisions upon this subject, which is, that when the use for which private property is taken is of a public character, it rests in the wisdom of the legislature to determine when, and in what manner, the public necessity requires its exercise, and with the reasonableness of the exercise of that discretion, courts will not interfere; *Charles River Bridge* v. *Warren Bridge* 11 Pet. 420; *Swan* v. *Williams*, 2 Mich. 427; *Beekman* v. *Sar. & Schenect. R. R. Co.*, 3 Paige 73; *Harris* v. *Thompson*, 9 Barb. (S. C. R.) 350; *Hartwell* v. *Armstrong*, 19 Barb. (S. C. R.) 166.

It is not denied by the petitioner's counsel but that the taking in this case was in some sense for a public use, but it is insisted that it is too limited and local in its character; and benefits so small a portion of the community that the legislature cannot exercise this power in its favor; that it must be for some use that may be enjoyed by the entire community.

But this doctrine is not supported by any of the cases. Every public use is, to some extent, local, and benefits a particular section more than others. Railroads and canals, the most extensive of our public works, do so in some degree. Burying grounds, aqueducts, mills, and many highways, are as purely local as this, and no person can derive benefit from them except by becoming a resident in their vicinity. In the same way this use may be for the benefit of any citizen. But the use in the present case has a more enlarged and liberal view. It is a benefit and advantage to the whole country, that all the children should be edu-

cated, and thus any means of educating the children in a single district benefit the whole. To accomplish this great object of educating the whole, it becomes necessary that a great number of schools should be supported to make them accessible to all ; but the principle remains the same, as if all the children in the State could attend a single school; they are all but separate means to accomplish the same great and general benefit.

As before said, the cases upon this subject do not warrant the assumption, that the use must be universal, and one that may be participated in by all.

In *Hartwell* v. *Armstrong*, cited above, the true principle is well stated : "The use is not required to be universal, nor in the largest sense even general. If it is confined to a specified district it may still be public. If some parties are more benefitted than others, this forms no objection to the use, if the public interest and convenience are thereby subserved."

The general doctrine to be extracted from all the cases is very concisely stated in a highly approved essay on this general subject, found in the Law Reporter, Jany., 1858 : " Property may be taken for any object calculated to benefit the State, a city, or county, a town or a village ; and there seems to be no definite rule as to the extent of territory to be benefitted in order to warrant such a taking. For the good of the State consisting in the welfare of its component parts, whatever tends to promote their prosperity, benefits indirectly the State itself."

It is urged also, that no such necessity exists for this compulsory mode of enabling school districts to procure sites for school houses, as justifies the enactment of the law in question.

It has been already shown that the general language of the courts has been, that where the use is a public one, it rests wholly with the legislature to say, whether sufficient necessity exists to justify granting the power to take private property therefor, and that courts will not interfere with their discretion, at least, not unless the entire absence of any necessity be shown. We do not doubt but that in most districts, and probably a great majority of them, suitable sites for school houses can be obtained by voluntary purchase, but it is not universally true.

It may happen that the entire territory of a district may be

Williams *v.* School District No. 6, in Newfane.

owned by one individual, (such instances are believed to exist in this State,) and in such case, should he refuse to sell a site for a school house, none could be built. Such cases would undoubtedly be very rare, but it is by no means uncommon for one person owning a large farm in the central part of a district, to own the only suitable and convenient site for a school house, and many persons deem a district school so undesirable a neighbor that they would not voluntarily have one near them. It is of the first importance, to the success of our district school system, that school houses should be conveniently located, and as the districts are required to have them, and as cases might occur when they would be entirely unable to fulfill this duty without the aid of such a law as the present, were we to take the place of the legislature on this question, we should be unable to say that the exercise of the power in this instance was unwise.

It would be hard to require school districts by law to erect school houses and support schools, and not place within their reach the legal power to enable them to comply with the legal requirement.

Whether in this particular case the requisite necessity existed to authorize taking the petitioner's land, was a question of fact to be determined solely by the commissioners and the county court; *West River Bridge Co.* v. *Dix et al.*, 16 Vt. 446; *Paine* v. *Leicester*, 22 Vt. 44.

It is urged that this power will be liable to great abuse; that school houses may be thereby unsuitably located, purposely to annoy and vex some person. But it seems to us there can be but very little danger of any such injustice, where the act provides for an appeal to the county court and a revision of the action of the selectmen by a disinterested board of commissioners; at least no greater danger than in taking land for highways, or any of the other public uses. But whatever there might be of the objection, it is one to be addressed to the legislature, not to us.

It is objected to the proceedings in this particular case that they have taken the fee of the petitioner's land, so that should the district cease to use it as a site for a school house, the land would not revert to the petitioner; that they have taken more

LAW SCHOOL LIBRARY.

land than was needed to erect a school house upon; and that the petitioner has not received full compensation in money for his damages, but that a portion of the damages are compensated by requiring the district to fence the land taken.

We regard these objections as all without just foundation. As to the first, the proceedings do not profess to give a fee in the land to the district, and, if they did, would probably be wholly ineffectual to produce any such result.

In relation to the quantity of land taken, we do not regard the act as merely authorizing the taking of just so much land as would be covered by the school house, but of such quantity as may be necessary for the proper and reasonable enjoyment of it, and we cannot say that too much was taken in this instance; that was a matter resting with the commissioners and county court; their judgment concludes us.

In regard to the compensation, it does not appear to us that the fencing the land by the district is to be regarded as compensation to the petitioner.

It does not appear on the face of the proceedings but that the damages appraised to the petitioner were the full value of all the land taken, but it is reasonable to suppose that for the reasonable use and enjoyment of the residue of his land, a fence would be necessary to separate it from the land taken. If the petitioner was required to build the whole or part of it, it would be an additional loss or damage beyond the value of the land taken; but by requiring the district to fence the land taken, this additional damage is not sustained, and therefore no compensation required.

We are therefore of opinion that the law under which the petitioner's land was taken is not repugnant to the constitution, and that the proceedings by which it was taken are regular, and his petition is therefore dismissed with costs.