## Case No. 15,441.

### UNITED STATES v. INLOTS.

[2 Am. Law Rec. 314, 513.]

Circuit Court, S. D. Ohio. Nov., 1873.

CONSTITUTIONAL LAW—POWERS OF UNITED STATES IN RESPECT TO EMINENT DOMAIN — CONDEMNATION OF LAND FOR POST-OFFICE BUILDING — JURISDICTION OF CIRCUIT COURTS—STATE STATUTES—PROCEDURE—MEASURE OF DAMAGES.

[1. The constitutional provisions giving to congress authority to establish post offices and post roads, and to make all laws for carrying into effect the enumerated powers, taken together with the declaration that all laws made in pursuance of the constitution shall be the supreme law of the land, invest congress with authority to condemn lands situated within a state for use as a post-office site.]

[2. By an act of March 12, 1872 [17 Stat. 39], congress authorized the secretary of the treasury to purchase a site for a post-office, customhouse, etc., in Cincinnati. By the subsequent act of June 10, 1872 [17 Stat. 353], it appropriated money for the "purchase, at private sale or by condemnation," of the site selected. Held, that the latter act was a construction of the previous one and clearly recognized it as conferring power to condemn the lands if necessary.]

[3. A proceeding brought by the United States to condemn land for public use is a suit of a civil nature at common law, within the meaning of the judiciary acts vesting jurisdiction in such cases in the circuit courts of the United States.]

[4. By the act of February 15, 1873, the state of Ohio provided a mode of proceeding in its courts for condemnation of land by the United States where previous consent of the state legislature had been obtained therefor. Held, that by the provision of the judiciary act of June 1, 1872, adopting the practice, etc., of the state courts in proceedings other than eq-

uity and admiralty causes, this method of proceeding was to be adopted by a federal court in condemning lands within the state.]

[5. The Ohio statute regulating the condemnation of lands (69 Laws, 88) allows separate trials as to separate parcels of property only, and not as to the separate interests of different parties in each parcel; but, where no controversy exists as to the title to such interests, they may be separately presented to the jury, in such order as may be convenient, and the jury will be instructed to state the several amounts to which the claimant is entitled.]

[6. The measure of compensation, where property is condemned for the use of the United States, and the entire property is taken, is the fair, full market value of the property, in cash, without any allowance for loss of custom of storekeepers carrying on business in the building, by failure or delay in finding another place, or for depreciation of stock during suspension of business, and loss of sales by removal to a less favorable location, or for the value of movable property not attached to the premises.]

By act of March 12, 1872 [17 Stat. 39], congress authorized the secretary of the treasury to purchase a site for a public building in Cincinnati, and by act of June 10, 1872 [17 Stat. 353], appropriates money for the "purchase, at private sale or by condemnation," of the site selected. In March, 1873, the secretary of the treasury selected the grounds described in this case, and authorized the district attorney to proceed to condemn the same. By act of Ohio legislature April 20, 1872, consent of the state was given and jurisdiction ceded, when "the United States shall have acquired the title to the said lands, by purchase or grant, or by lawful appropriation under the right of eminent domain." By act of February 15, 1873, the legislature provided by general law for proceedings of condemnation by the United States, which, according to the provisions of that law, should "in all respects be governed" by the act prescribing the mode of assessment, etc., of compensation to the owners of private property by corporations, of April 23, 1872, and acts amendatory thereof, that shall be in force when such proceeding shall take place. Under the authority of the secretary of the treasury, and in pursuance of such laws of the state of Ohio, the district attorney filed a petition in the circuit court, against the land and the owners thereof, for the condemnation of the site selected. Some of the owners demurred to the petition, and others moved to dismiss the case for want of jurisdiction.

The case was heard on the demurrers and motion before EMMONS, Circuit Judge, and SWING, District Judge.

Judge Hoadly, Judge Whitman, and E. W. Kittredge, in behalf of the demurrers.

Warner M. Bateman, U. S. Dist. Atty.

Judge Taft, in behalf of other owners, in support of the jurisdiction.

Judge Whitman opened the case and insisted—First, that the government did not possess the right of eminent domain; second, that congress had not authorized the condemnation; and, third, the laws of congress had not conferred jurisdiction on the circuit court in such proceeding.

Judge Hoadly, in the same behalf, insisted:

1. This proceeding is strictissimi juris,—being an effort to take property of citizens without their consent. Therefore all reasonable doubts must be resolved against the government, and unless the jurisdiction is clearly shown to have been conferred by law, it does not exist. 46 N. Y. 546.

2. The circuit court is not a court of general, but limited, jurisdiction, and has no power but such as is expressly given by law. As was said by Chief Justice Ellsworth, in 1799, this court has only jurisdiction in a few well-ascertained cases. [Turner v. Enrille] 4 Dall. [4 U. S.] 8; [McCormick v. Sullivant] 10 Wheat. [23 U. S.] 192.

3. Even if the right of eminent domain is vested by the constitution in the United States, the constitution does not execute it in this regard, but legislation is necessary to confer the power to execute it upon the circuit court. [Sheldon v. Sill] 8 How. [49 U. S.] 449.

4. The act of Ohio of February 15, 1873, does not confer any jurisdiction on this court, nor can the state confer any jurisdiction on this court. The proceedings under that act are, by its express terms, to be had in the probate court of Hamilton county, and cannot be taken elsewhere. [The Orleans v. Phœbus] 11 Pet. [36 U. S.] 175.

5. Nor does the Ohio act of April 20, 1872, authorize a condemnation proceeding in this court or elsewhere. It only cedes jurisdiction over the land when purchased or condemned, and gives the state's consent as required by the constitution to the acquisition of the title by the United States. It does not even profess to authorize a condemnation.

6. The decisions of the supreme court of the United States limit the jurisdiction of the federal courts, as founded on state statutes, to cases arising under general rules of property, or general rules applicable to injuries, to individuals in their persons or estates, not to instances of state consent to specific acts and transactions, as here to condemnations limited to the probate court only. [Chicago & N. W. R. Co. v. Whitton] 13 Wall. [80 U. S.] 270.

7. No act of congress authorizes this condemnation. The only act ever passed by congress even mentioning condemnation, is the appropriation act of March 10, 1872, which has long lost its force by lapse of time, and has been repealed by the act of March 3, 1873, substituting an appropriation of $750,000, and which only recognizes the secretary's right to purchase, not condemn.

8. Nor can this court take a concurrent jurisdiction under the act of 1789, for this is not a suit at law or in equity, but a proceeding sui generis, known in the law as an appropriation

or condemnation proceeding, and which both by the Ohio Code and the act regulating proceedings to appropriate, is distinguished from the civil action in which suits at law and in equity are in Ohio fixed. Nor is there any suit that can be concurrent, because the Ohio proceeding is limited to appropriations in favor of private corporations, and so far as the act of February 15, 1873, authorized the United States to proceed in the probate court, limited it to that court, and thus forbade concurrence. There can be no suit concurrent with another suit when that other suit forbids and is exclusive of the former, and of every other.

Warner M. Bateman, Dist. Atty., on behalf of the United States, maintained that the United States possesses the right of eminent domain within the limits of its enumerated powers; that that right is an incident of sovereignty, and belongs to the state for the general uses over which it has control, and to the general government for such uses as come within its powers. U. S. Const. art. 1, § 8, pars. 8, 19; Id. art. 6, par. 2; Const. U. S. Amend. art. 5; 23 Mich. 472; Cooley, Const. Lim. 525; 1 Kent, Comm. 268, note A; 2 Story, Const. § 1274; 7 Dana, 119, 126; 14 Md. 478; 7 Op. Attys. Gen. U. S. 144.

Second. That the purpose for which the ground that in this case is sought to be condemned, is a public use and indispensable to the exercise of the powers and performance of the functions vested in the government by the constitution. U. S. Const. art. 1, § 8, pars. 2, 8; Id. art. 3.

Third. The act of March 2, 1872, authorizing the secretary of the treasury to purchase, and of June 10, 1872, making appropriation for the purchase, at private sale or by condemnation, authorizes the condemnation and determines the necessity of the appropriation.

(a) The term purchase embraces, in its legal signification, condemnation of property under the right of eminent domain. 106 Mass. 364, and text-books.

(b) In this sense has congress used the term in this case and in contemporaneous legislation. 17 Stat. 24, 353; U. S. v. Block, 121 [Case No. 14,610].

Fourth. The provision of section 11 of the judiciary act of 1789, defining the jurisdiction of the circuit court, embraces this class of cases as "suits of a civil nature at common law," in which "the United States are plaintiffs or petitioners," and of which the state courts have a concurrent jurisdiction.

(a) By the law of February 15, 1873, the legislature of Ohio conferred jurisdiction upon the probate court in proceedings of condemnation of property, for its own use, by the United States, and the jurisdiction claimed in the circuit court is therefore concurrent with that of the state courts. 70 Ohio Laws, 36.

(b) This proceeding, with its petition, demand, process, parties, trials, verdicts, judgments, and execution, is a "suit." [Parsons v. Bedford] 3 Pet. [28 U. S.] 433; 2 Bouv. Inst.

558; [Weston v. City Council of Charleston] 2 Pet. [27 U. S.] 449; [United States v. Wood] 14 Pet. [39 U. S.] 440; [West River Bridge v. Dix] 6 How. [47 U. S.] 529; [Cohens v. Virginia] 6 Wheat. [19 U. S.] 264; Conkl. Adm. (4th Ed.) 30.

(c) It is a suit at "common law," being brought to enforce a right at law as distinguished from a right and remedy in equity or admiralty. Parsons v. Bedford, 3 Pet. [28 U. S.] 433.

Fifth. A mode of proceeding derived from the laws of Ohio, exists, by which the jurisdiction may be exercised.

(a) Irrespective of express legislation of congress, the United States, having the right to sue in the circuit court, has the right to pursue therein the remedies and modes of proceeding authorized by the state in its own courts in like cases. Parsons v. Bedford, 3 Pet. [28 U. S.] 433; Wilson v. Mason, 1 Cranch [5 U. S.] 45; Ex parte Biddle [Case No. 1,391]; Supervisor v. Rogers, 7 Wall. [74 U. S.] 175; Clark v. Soheir [Case No. 2,835].

(b) Nor will an express provision in the local law, limiting the right or remedy to the local courts, affect the right of a party otherwise authorized to sue, to pursue them in the federal courts. Radway v. Whitten, 13 Wall. [80 U. S.] 270; Ingham v. Broadnax, 14 Pet. [39 U. S.] 67; Union Bank of Tenn. v. Jolly, 18 How. [59 U. S.] 506; Hyde v. Stone, 20 How. [61 U. S.] 170; Payne v. Hook, 7 Wall. [74 U. S.] 425.

(c) But the act of June 1, 1872 (17 Stat. 197), prescribed that the "practice, pleadings, and forms and modes of proceedings in other than equity and admiralty causes in the circuit and district courts of the United States, shall conform, as near as may be, to the practice, pleadings, and forms and modes of proceedings existing at the time, in like causes, in courts of record of the state," etc.

(d) The legislature of Ohio, by act of February 15, 1873 (70 Ohio Laws, 36), has provided a mode of proceeding for the condemnation of lands by the United States in the probate court, a court of record of the state. By virtue of the act of congress, above referred to, this law of the state is made the rule of practice in like causes in the federal courts, and in precise pursuance of this practice the pleading in this cause is framed and filed.

E. W. Kittredge, in behalf of defendants, presented the following points of argument:

First. That the power of eminent domain of the national government is entirely distinct from the power inherent in the state government.

Second. That the plaintiff must come into this court under the power inherent in the one or the other of these governments. That is, it can not come here in this cause to take property for the public use as the agent of the state by virtue of its power of eminent domain, and at the same time be here to take

the property by virtue of the power of eminent domain of the national government.

Third. If the government of the United States has not authority, the exercise of its power of eminent domain, for the purpose specified in this petition, within this or any other court, can have jurisdiction of a cause wherein it is sought to appropriate this property by virtue of the power of eminent domain inherent in the government of the United States.

Fourth. Congress has not authorized the exercise of the power of eminent domain inherent in the national government to take this property. It is not included in the power of the secretary given in one or all of the three acts to purchase a site for a court-house. Nor has it authorized this court to exercise any jurisdiction in this case under its power of eminent domain. 17 Stat. 39, 352, 523; 106 Mass. 356. The state's power of eminent domain is a sovereign power; when granted to any corporation or individual it is exercised by it as the agent of the state. 18 Ohio St. 92.

Fifth. That is just as true when the agent to whom the power is or may be granted by the state is the national government, as when it is a private corporation.

Sixth. The case is entirely different from the grant of a new remedy or right of action by a state law, as in the case of an action for death caused by negligence, or of a remedy for the partition of real estate. In such cases the state law can not, strictly speaking, create or confer a right. It simply prescribes a remedy to enforce a right. That is to say, it removes an obstruction and provides a channel for the administration of justice. In such a case the United States court may have jurisdiction to administer the remedy without regard to the provision of the state law upon that subject. But when the state grants to its agent authority to exercise its own power of eminent domain, it can affix to the grant whatever limitations or conditions it chooses. It may prescribe in what form, in what tribunal, and on what conditions the power shall be exercised by its agent, to whom it is granted. And the United States, if it accepts the grant, like every other corporation or individual, must accept it and exercise it precisely in the mode, and in the tribunal, and subject to all the conditions which the state legislature has prescribed. [Chicago & N. W. R. Co. v. Whitton] 13 Wall. [80 U. S.] 285; Ex parte Biddle [Case No. 1,391].

Seventh. And finally, I submit that the national government has not authorized the exercise of its power of eminent domain at all to acquire property for this purpose. And the state has not authorized the exercise of its power of eminent domain by any proceeding in this court, or in any court except the probate court of Hamilton county, and therefore this proceeding in the circuit court of the United States is wholly unauthorized by law, and without the jurisdiction of this court.

Before EMMONS. Circuit Judge, and SWING, District Judge.

SWING, District Judge. The petition sets forth in substance the grant of power to the secretary of the treasury to purchase a site for post office, custom-house, and other government buildings that the secretary is unable to agree with the owners of the site selected as to its value, and prays its condemnation. To the petition a demurrer has been filed by one defendant, and others have filed a motion to dismiss the petition. Each raises the question of jurisdiction of the court, but the questions presented and argued go to the very foundation of the power of the government to exercise the right of eminent domain.

There are three provisions of the constitution that bear upon the question of the right of the government to exercise the power of acquiring the title to the property, for the uses alleged, by condemnation. Article 1, § 8, par. 8, authorizes congress to establish post offices and post roads, and paragraph 19 of the same section authorizes it "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers." And article 6, par. 2, provides that "the constitution and the laws of the United States, that shall be made in pursuance thereof, . . . shall be the supreme law of the land, . . . anything in the constitution or laws of any state to the contrary notwithstanding." By the 5th article of the amendments to the constitution, it is among other things provided, "nor shall private property be taken for public use without just compensation." It has been repeatedly decided that this limitation is upon the power of the federal government to take private property in the exercise of the right of eminent domain. The distinction between state and federal sovereignty is well defined by Chief Justice Taney, in Abelman v. Booth, 21 How. [62 U. S.] 516. He says: "The powers of the general government and the state, although both exist and are exercised within the same territorial limits, are yet separate and distinct sovereignties, acting separately and independently of each other within their respective spheres;" and again: "That in the sphere of action assigned to the general government, it should be supreme and strong enough to execute its own laws by its own tribunals, without interruption from a state or from state authorities." This seems to us the only true view of the respective powers of the state and federal governments. Each within its own sphere is supreme and independent of the other. But in case of a conflict the constitution of the United States provides that the federal jurisdiction under it shall be supreme. It is a fundamental principle recognized by all jurists, that the right of eminent domain inheres in, and is a part of, the powers belonging to sovereignty. The constitution has expressly delegated to congress the power to

establish post offices and post routes. This necessarily includes the right and power to acquire sites for post offices. Having this power, is there any limitation upon the power of the United States as a sovereignty, in the mode of acquiring title? It seems to us there is not, and that as an incident of its sovereignty it may acquire title by its own appropriation, being governed in the exercise of this power by the provision we have quoted from article 5, of the amendments to the constitution. It is clear that contingencies are possible in which this is the only mode in which the federal government could be enabled to perform its functions within the states. Suppose, for instance, that the state of Ohio should forbid the acquisition of property for a post office in Cincinnati, or for the establishment of the necessary custom-houses, arsenals, or court-houses, would the federal government be powerless? If so, it would be practically excluded, from Ohio, in its most important functions. It seems to us its right to appropriate private property, for its public uses, is clear. The use alleged in the petition is of the class expressly provided for in the constitution. It is claimed, however, that this is not a public use, and the views of Judge Woodbury, in West River Bridge Co. v. Dix, 6 How. [47 U. S.] 507, was cited. They were given in arguendo in his dissenting opinion on a point that did not arise in the case. He says: "But when we go to other public uses, not so urgent, not connected with precise localities, not difficult to be provided for without this power of eminent domain, and in places where it would be only convenient but not necessary, I entertain strong doubts of its applicability. Who ever heard of laws to condemn private property for public use, for a marine hospital or prison? So a custom-house is a public use for the general government, and a court-house or jail for a state. But it would be difficult to find precedent or argument to justify taking private property, without consent, to erect them on, though appropriate for the purpose."

This doubt expressed by Judge Woodbury is certainly not warranted by the later authorities, and practice of the general and state governments. The laws of Ohio, of frequent application, provide for condemnation of lands for school-houses, jails, and other such public purposes, and the acts of congress cited in argument, provide for condemnation of sites for custom-houses and post offices. Those of Boston, Chicago, and St. Louis, now in process of construction, were acquired in that way. Cooley, Const. Lim. p. 533, 33 Vt. 271. The learned judge seems to confound public use with the necessity for the appropriation. Of the latter the legislature is the sole judge. There are few uses that can be conceived of more public than that of a post office, to the citizens of Cincinnati, and those of the whole country in communication with them, than the post office proposed to be erected. So the business of the courts to be provided for is

of the greatest interest to the public. Sixteen hundred cases in bankruptcy, pending and disposed of in the district court of this district, affect every business interest of its citizens.

We have not overlooked the decisions in 3, 9, and 13 Howard, and 6 McLean, referred to by counsel for the defense. The first three decide that the right of eminent domain in land, between high and low water mark, is in the state exclusively, and the latter relates to the power of the state government. For general public uses the power of eminent domain exists with the state which, under our form of government, has control over such uses. Judge Cooley states the principle in his work on Constitutional Limitations (page 525): As under the peculiar American system the protection and regulation of private right, privileges, and immunities in general property pertain to the state governments, and those governments are expected to make provision for those conveniences and necessities which are usually provided for their citizens through exercise of the right of eminent domain, the right itself, it would seem, must pertain to those governments, also, rather than to the government of the nation; and such has been the decision of the courts. So far, however, as it may be necessary to appropriate lands or other property for its own purposes, as for forts, lighthouses, military posts, or roads and the like, the general government may still exercise the right within the states, and for the same reasons on which the right rests in any case, viz., the absolute necessity that the means in the government for performing its functions and perpetuating its existence, should not be subject to be controlled or defeated by the want of consent of private parties or of any other authority." But it is said that no law has been passed by the general assembly authorizing the exercise of this right by the United States. It may be doubtful whether the state can impose any limitation upon the mode by which the United States may acquire title, but in this instance the act of April 20, 1872 (69 Ohio Laws, p. 81), not only does not prohibit, but authorizes the acquisition by this mode. The first section grants the consent of the state to the purchase, and the fourth section vests jurisdiction when the United States shall have acquired the title to the land, by purchase, grant, or by lawful appropriation under the right of eminent domain. The act of February 15, 1873 (70 Ohio Laws, p. 36), provides a mode of proceeding in its own courts for appropriation of land by the United States, and vests jurisdiction therein in the probate court.

It is further said that congress has not authorized, in this case, the condemnation of private property. We recognize the fact that the condemnation of private property is in derogation of common right, and accept the rule as stated by the court in New York & H. R. Co. v. Kip, 46 N. Y. 546, that the

grant of power is not to be extended by implication, and the act conferring it must be strictly complied with; but the laws granting it are not to be construed so strictly and literally as to defeat their object. Applying these principles of construction to the acts of congress providing for the erection of a post office in Cincinnati, what was their object? ' Was it to provide for the acquisition of property in a particular mode or to authorize it generally? The several acts, being in pari materia, must be construed together. The first act of March 12, 1872 (17 Sess. Laws, p. 39), simply authorizes the secretary of the treasury to purchase a suitable site for the erection of a building for the accommodation of the United States courts. It is conceded that the term "purchase" technically includes the acquisition of title by condemnation, and must be so construed when the terms of the law recognize that mode of acquisition. The subsequent act of June 10, 1872 (17 Stat. pp. 352, 353), clearly adopts the technical meaning of the term "purchase." It provides the necessary funds "for the purchase at private sale or by condemnation." From these statutes, taken together, it must clearly appear that congress has authorized the taking of private property, for the purpose of the public buildings named, by the process of condemnation in the exercise of the right of eminent domain vested in the federal government.

It is further claimed that the laws of the United States provide no rules of practice or mode of proceeding for the condemnation of private property for public use. The necessity for such provision is conceded. By the fifth section of the act regulating the practice in the federal courts, approved June 1, 1872 (17 Stat. 197), it is provided: "That the practice, pleading, and forms and modes of proceeding in other than equity and admiralty causes, in the circuit and district courts of the United States, shall conform, as near as may be, to the practice, pleading, and forms and modes of proceeding existing at the time, in like causes, in the courts of record of the state within which such circuit or district courts are held." The laws of Ohio prescribe the mode of proceeding for the condemnation of private property on the part of the state for its public works, and on the part of municipal and private corporations for various public uses, and by act of February 15, 1873.— the legislature of the state (70 Ohio Laws, p. 36),—a mode of proceeding in its courts is provided for the condemnation of lands for public buildings by the United States, where the previous consent of the legislature shall have been obtained therefor. By virtue of the 5th section of the act of congress above referred to, this act of the legislature of Ohio is made a rule of practice and proceeding in like causes in this court, not as a law of Ohio, but as a law of the United States. It is as much a rule of procedure for this court, as the Code of Ohio, prescribing the pleading

and practice in cases at common law, or as the laws prescribing the forms and modes of civil process, in the courts of the state. This law provides for the filing of a petition setting forth, among other things, the authority for the condemnation, the selection, and description of the property to be condemned, and the names of persons claiming legal and equitable interests therein; for the issuing and service of process against resident, and for publication of notice against non-resident owners; for the selection and impanneling of a jury, their oath, and the proceeding upon trial, the payment of the compensation assessed and costs. The law carefully secures the rights of property owners, and provides every guard against unreasonable hardships of such compulsory appropriation of their property.

It is further claimed that congress has conferred upon this court no jurisdiction to entertain and try this case. The right of eminent domain existing in the United States, the authority for making the condemnation having been granted by congress, and a mode of procedure existing for making it, we think jurisdiction is vested in this court to entertain and conduct it. Section 11 of the judiciary act of 1789 (1 Stat. 78) provides, that "the circuit court shall have original cognizance concurrent with the courts of the several states, of all suits of a civil nature at common law . . . when the matter in dispute exceeds, exclusive of costs, the sum or value of five hundred dollars, and the United States are plaintiffs."

The definition of a "suit" by text-writers is very comprehensive. But our supreme court has repeatedly construed the term. In Parsons v. Bedford, 3 Pet. [28 U. S.] 747, "suits at common law" are construed to be proceedings in which legal rights are to be ascertained and determined, as distinguished from equity and admiralty proceedings. This is the case whether the rights are created and proceedings prescribed by statute, or exist at common law. Ex parte Biddle [supra]. In Cohens v. Virginia, 6 Wheat. [19 U. S.] 264, Chief Justice Marshall says: "What is a suit? We understand it to be the pursuit of some claim, demand, or request. In law language it is the prosecution of some demand in a court of justice." Although we are not aware that the term "suit," as used in the eleventh section of the judiciary act, has been passed upon by the supreme court, it has several times construed the term as used in the 25th section. In Weston v. Charleston, 2 Pet. [27 U. S.] 449, it is applied to a writ of prohibition; in Holmes v. Jennison, 14 Pet. [39 U. S.] 540, to a proceeding in habeas corpus; and in West River Bridge Co. v. Dix [supra], which was a proceeding for condemnation of land for a school-house, under the laws of Vermont, no question seems to have been raised as to the jurisdiction of the supreme court, but it was acted upon as a suit. We know

of no reason for giving the term "suit," as used in the 11th section, a different definition from that clearly established as to the term, in the 25th section of the judiciary act. The distinction claimed by the counsel for the defendants, seems indeed arbitrary and unreasonable when we look into this case. It has all the essential forms, proceedings, and objects of ordinary suits at law. It has pleadings, parties, issues, and process, a jury, trials, verdicts, and judgments, bills of exception, and writs of error, as other cases. It ascertains and adjudges damages, and awards execution.

EMMONS, Circuit Judge, concurred in the opinion given by SWING, District Judge. The demurrers and motions to dismiss must be overruled.

THE COURT having found upon a preliminary inquiry provided for by the statute of Ohio governing the proceeding that there exists a necessity for the appropriation—a legal right to make it—and that the United States was unable to agree with the property owners as to compensation, a motion was made, on behalf of numerous claimants, leaseholders, for longer or shorter terms, for a separate trial of the value of their several interests.

Judge Whitman, Mr. Kittredge, Mr. Von Seggern, and Mr. E. M. Johnson, on behalf of the lessees, cited in support of the motion: Chase, St. 1475; Symonds v. City of Cincinnati, 14 Ohio, 175; Cooper v. Williams, 4 Ohio, 265; Bates v. Cooper, 5 Ohio, 115; Ellis v. Welch, 6 Mass. 251; Parks v. Boston, 15 Pick. 203; Patterson v. City of Boston, 20 Pick. 159; Giesy v. Cincinnati, W. & Z. R. Co., 4 Ohio St. 300; Foote v. City of Cincinnati, 11 Ohio, 408; Tayl. Landl. & Ten. § 519; 7 Wend. 210–215; 69 Ohio Laws, 88.

Judge Taft claimed, on behalf of two of the owners in fee, that while the statute of Ohio, under which the proceeding was conducted, provided that there should be separate trial as to each parcel of property appropriated, it contemplates that the jury in their verdict should severally assess and determine damages to which the owner of each interest therein was entitled.

The district attorney contended that the law governing the proceeding (69 Ohio Laws, 88) required that there should be but one trial as to each parcel, irrespective of the division of interest, and one verdict for the total damages. That the measure or compensation when the entire property was taken, being its fair market value in cash, the law did not charge the petitioner with the burden of controversies arising in its division among the parties in interest; but that, inasmuch as the mode provided by law (sections 19 and 20) for apportioning this compensation among the owners of the different interests was inapplicable to the judiciary system of the United States, it would

be both convenient and proper that the court, following the practice of the state law in condemnation of property by municipal corporations, should permit the value of the several interests to be shown on the trial, and to instruct the jury to ascertain and determine them in their verdict as parts of the total compensation to be paid by the government.

SWING, District Judge, taking the motion under consideration, on a subsequent day overruled it, holding that the law allowed separate trials as to separate parcels of property only, and not as to the separate interests therein; but that, where no controversy existed as to the title to such interests, they could be separately presented to the jury in such order as might be convenient, and the jury would be instructed to return in their verdict the several amounts of the compensation to which each claimant would be entitled.

Defendants further moved for a special venire for a jury from Hamilton county, in which Cincinnati is situated, which THE COURT overruled, holding that such divisions of territory under the state government could not be taken into consideration in electing and impanneling juries in the federal courts. Thereupon, on motion of both parties, a struck jury was ordered, and selected by mutual agreement, and the cause adjourned for trial to November 3, 1873.

The half square appropriated consisted of twenty-four separate parcels or lots, of which the district attorney selected a lot in the center of the square, and extending through to the alley in the rear, to begin with. The improvements thereon consisted of a new stone-front and an old building, both fronting on Fifth street, and a frame stable on Patterson alley. On the 5th of November the panel was completed and jury sworn, when the claims of the several persons interested were in order stated to the jury, beginning with the owner in fee, F. Bodman. The old brick building was occupied by John A. Smith as a dry-goods store, under a lease from month to month. He claimed as damages: 1. Loss of goodwill. 2. Cost of removal of stock. 3. Injury to stock in removing it. 4. Profits lost and expenses during suspension of business in changing to new location. 5. Increased rent he would have to pay at another suitable location. 6. The value of fixtures, consisting of shelving, counters, stools, desks, show-cases, and glass show fronts,—amounting in all to about $16,000.

John B. Briggel, who occupied the first story of the stone-front, under a lease of four years, signed and sealed but not acknowledged. He obtained the lease after this property had been spoken of as a site for the post-office, and after he had taken possession. When he applied to F. Bodman for the lease, he stated that he wanted it so as to enable him to make claim against the

United States if it should appropriate the property, but agreed with Bodman that in the event of such appropriation the lease should be void as against him, and he would make no claims against him. In addition to claims similar to those presented by Smith, he made further claim for the value of the unexpired term of his lease, amounting in all to about $21,000.

Fox & Brothers occupied the second story of the stone-front house for a term, under a verbal lease, that the lease should be null and void in the event of the appropriation of the property by the United States. They were engaged in the manufacture of silverware, and had a furnace, benches, gas fixtures, and plumbing, for which they claimed compensation; they also claimed for the value of their unexpired term.

H. H. Davis occupied the stable, under a lease for a term of years, duly executed and acknowledged, and claimed compensation for the value of the use of the stable, over and above the rents paid, and also the value of the building which he had himself erected. The stable was used in connection with a livery stable on the opposite side of the alley, for which use the lease was claimed to be very valuable.

Lentz occupied the fourth story of the stone-front as a box-factory, and claimed value of his fixtures and of his unexpired term. His lease is sufficiently described in the charge of the court.

After a large amount of testimony was given by Bodman, as to the value of the land and improvements, numerous witnesses were examined by the tenants severally, as to the damages claimed, as aforesaid, by them. This testimony was admitted subject to objections by the district attorney, and at the close of the testimony by the claimants, he moved to exclude all evidence as to damages demanded by the tenants, except such as related to the value of the unexpired term, and of store-fronts and shelvings.

The district attorney and Assistant District Attorney Richards insisted that the only rule of damages applicable in the case is that of the constitution, which provides: "Nor shall private property be taken for public use without just compensation." Article 5, Amendments. Statutes frequently increase this liability by including damages incident to and resulting from the owner from such taking. It is not the case here. The government is only liable to make "just compensation" for the property taken.

2. The rule of compensation, when the whole of a tract or lot of land is taken, is its fair market value at the time of taking. Dill. Mun. Corp. 417; Cooley, Const. Lim. 565; Giesy v. Cincinnati, W. & Z. R. Co., 4 Ohio St. 331; Robb v. Maysville & Mt. S. T. Road Co., 3 Metc. (Ky.) 117.

3. When a part of a tract or lot only is taken, a more complex rule is necessary in ascertaining the measure of just compensation. Of this class of cases are the cases of Patterson v. Boston, 20 Pick. 162, 23 Pick. 425; Giesy v. Cincinnati, W. & Z. R. Co., 4 Ohio St. 331.

4. That the taking of the property by the United States is lawful, and in virtue of its transcendent right and title, and it is, therefore, not liable for damages resulting from such taking, unless the law authorizing it so provides. 5 Ohio St. 573; Sedg. Dam. 565; 4 Comst. [4 N. Y.] 196; 4 Ohio St. 583.

5. That the damages for loss of good-will, loss of profit, and expenses during estimated period of suspension, and increased rents in another suitable location, are consequential, and so remote and uncertain as to be incapable of just computation. They are not allowable upon principle or authority. Schuylkill Nav. Co. v. Thoburn, 7 Serg. & R. 420; Henry v. Pittsburg & A. Bridge Co., 8 Watts & S. 85; Searl v. Lackawanna & B. R. Co., 33 Pa. St. 63; Hatch v. Vermont Cent. R. Co., 25 Vt. 67; Burbridge v. New Albany & S. R. Co., 9 Ind. 546; 2 Barn. & Adol. 198; 22 E. C. L. 91.

6. As to costs of removal: The claimants being bound by the conditions of their respective leases to remove their property at the end of their terms, the act of appropriation only changes the time when the removal should take place, but does not occasion the obligation to remove, and that, therefore, the government is not justly chargeable with the losses consequent upon removal, but is only liable for the value of the right to remain or of the occupancy for the unexpired term of the lease.

As to the value of the store-fixtures attached to the building and becoming a part of the property of the landlord, as a part of the realty upon the tenants leaving them without removing them, the district attorney waived any question and assented that, if the tenant desired to leave them, the government should be charged with their value as for property appropriated.

Judge Mallon, on behalf of the tenants, insisted that the government was not only liable for the value of the property, but all losses to the owner resulting from its taking it. He cited Foote v. City of Cincinnati, 11 Ohio, 408; Robb v. Maysville & Mt. S. T. Road Co., 3 Metc. (Ky.) 117. In the loss to be compensated for was good-will and fixtures. Hathaway v. Bennett, 10 N. Y. 108; Sedg. Dam. 664, 665; St. John v. New York, 6 Duer, 319; 9 Q. B. 443; 1 Q. B. 98; McArthur v. Kelly, 5 Ohio, 140.

Mr. Kittredge, in behalf of tenants, contended that the state law did not affect the liability of the government, but that compensation under the constitution must be an equivalent for the whole loss sustained by the property owner. Alton & S. R. Co. v. Carpenter, 14 Ill. 190; White v. Charlotte & S. C. R. Co., 6 Rich. Law. 47. He is entitled to the full value of the property to him, for the uses he makes of it or for those to which it

is best adapted (Brown v. Providence, W. & B. R. Co., 5 Gray, 35; Lincoln v. Saratoga & S. R. Co., 23 Wend. 425), and for good-will (2 Thrust & Couls, 58), and for loss of time and expenses of removal (Patterson v. Boston, 20 Pick. 162, 23 Pick. 425).

SWING, District Judge, disposing of the motion, held that all testimony as to good-will, loss of custom by failure to find another place, of depreciation of stock during suspension of business, loss of sales by removal to less favorable location, and of the value of movable property not attached to the premises, was incompetent and must be excluded from the consideration of the jury; that these items were not elements of damages for which the claimants were entitled to compensation. He distinguished between the case of Patterson v. Boston and this case; that was an appropriation under the law of Massachusetts for a part of the premises, where the mode of ascertaining compensation was necessarily indirect, difficult, and complicated. In that case there was permanent occupation of part, and temporary disturbance of the possession of the balance of the premises, and the consideration of the items of damages then allowed would seem to be the best attainable mode of reaching a fair estimate of the value of the right appropriation. In this case the whole property is taken. It has a market value, as a subject of ordinary commerce that can be directly shown by testimony. The rule of ascertaining compensation in such cases, recognized by the authorities, is simple: What is the fair, full market value of the property in cash? The payment of this market value is compensation.

THE COURT reserved the question as to the expense and damage to personal property in removing it, for instruction thereon in his final charge to the jury.

[There were verdicts in these cases in favor of the United States, upon which the court rendered judgments, and adjudged that writs of possession issue, requiring the marshal to remove the defendants from the premises, and to place the United States in possession. Case No. 15,441a. From this judgment Mary R. Kohl and others sued out a writ of error in the supreme court. The judgments were affirmed. 91 U. S. 367.]